UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BACKPAGE.COM, LLC,

                Plaintiff,

and

INTERNET ARCHIVE,

              Plaintiff-Intervenor,

      v.

ROB MCKENNA, Attorney General of
the State of Washington, et al.,

     Defendants, in their official capacities.

CASE NO. C12-954-RSM

ORDER GRANTING PLAINTIFFS'
MOTIONS FOR PRELIMINARY
INJUNCTION

## I. INTRODUCTION

This matter comes before the Court on the Motion for a Preliminary Injunction filed by

Plaintiff Backpage.com, LLC ("Backpage.com") (Dkt. #2) and the Motion Joining in the Motion

for a Preliminary Injunction filed by Plaintiff-Intervenor, the Internet Archive ("IA") (Dkt. #34).

Backpage.com and IA ("Plaintiffs") seek to preliminarily enjoin enforcement of a new

Washington law, Senate Bill 6251 ("SB 6251"), which was scheduled to take effect on June 7,

2012.  SB 6251 criminalizes the offense of advertising commercial sexual abuse of a minor.  For

the reasons set forth below, Plaintiffs' motions are GRANTED.

## II. DISCUSSION

**A. Background**

   1. <u>Plaintiff Backpage.com</u>

      Plaintiff Backpage.com operates an online classified advertising service located at

www.backpage.com.  It is the second largest online advertising service and hosts millions of

advertisements per month throughout the country.  Ads displayed on Backpage.com's website

are categorized by state and city, then by topical category, such as local places, community,

buy/sell/trade, automotive, musician, rentals, real estate, jobs, forums, dating, adult, and services.

The advertisements themselves are created and posted by Backpage.com's users, who pay $5-

$10 to post ads in the adult category, $1 to post ads in the dating category, or otherwise post ads

for free.  Backpage.com requires that users pay any advertising fees by credit card. *See generally*

Dkt. #3.

      Pursuant to Backpage.com's Terms of Use, illegal content and illegal activity is

prohibited on the Backpage.com service.  *See* Dkt. #3, Ex. B.  Adult content and explicit material

is only allowed to be posted in designated adult categories by an adult who is over 18 years of

age.  *Id.*  "Obscene or lewd and lascivious graphics or photographs which depict genitalia, actual

or simulated sexual acts or naked images" are prohibited.  *Id.* at Ex. C ("Posting Rules").  Users

are instructed that "[a]ny post exploiting a minor in any way will be subject to criminal

prosecution and will be reported to the <u>Cybertipline</u> for law enforcement."  *Id.*

1        If a user comes across an ad that does not comply with these rules, the user may report

2   the ad to Backpage.com by clicking a Report Ad link in the ad.  Doing so brings the user to a

3   Report Ad page where he or she can select whether the ad is "Inappropriate or Illegal Content",

4   "Over Posted / Spam", or "Wrong Category."  *Id.* at F.  The webpage instructs users to email

5   abuse@backpage.com if the ad "involves a threat to a child or an image of child exploitation."

6   *Id.*

7        Users seeking to post or view material in the adult or dating categories are shown a page

8   entitled "Disclaimer" prior to entering those portions of the site.  *See Id.* at Ex. D.  The

9   disclaimer requires, *inter alia,* that the user represent that he or she is 18 years of age or older

10  and that he or she will report any suspected exploitation of minors and/or human trafficking to

11  the appropriate authorities.  The user must click on words "I agree" prior to entering these

12  portions of the Backpage.com website. *Id.*  A hyperlink on the page links to a popup window

13  entitled Stop Trafficking that lists phone numbers and tip lines that users can use to report

14  exploitation of children and human trafficking.  *Id.* at Ex. E.

15       Links to a page entitled User Safety "are available throughout" the Backpage.com

16  website.  *Id.* at ¶12 & Ex. H.  The User Safety page includes information on Responding to an

17  Ad, Placing an Ad, Safety Tips, Scams and Fraud, Human Trafficking, and Child Exploitation.

18  The Human Trafficking and Child Exploitation portions of the User Safety page provide links

19  and phone numbers for the National Human Trafficking Resource Center ("NHTRC") and the

20  National Center for Missing and Exploited Children ("NCMEC").  *Id.* at Ex. H.

21       Backpage.com also monitors content submitted by users to the adult and dating sections

22  of its website.  Most posts are filtered through an automated system that scans content for

23  approximately 26,000 "red-flag" terms, phrases, codes, email addresses, URLs and IP addresses.

24

1 Dkt. #3 at ¶13.  In addition, Backpage.com manually reviews "nearly all content" submitted for

2 posting to the adult and dating categories.  *Id.*  Most ads are reviewed for illegal and other

3 prohibited conduct prior to posting, then reviewed a second time once they are posted online.  *Id.*

4 Over 100 people and more than 80% of Backpage.com's workforce are engaged in this

5 monitoring process.

6  Backpage.com submits referrals for suspected juveniles posting on Backpage.com to

7 NCMEC.  When this happens, NCMEC prepares reports based on the referrals and forwards its

8 reports to the FBI.  *See* Dkt. #64, ¶ 4.  The FBI then distributes the reports to various local law

9 enforcement agencies, including the High Risk Victims section of the Seattle Police

10 Department's VICE unit.  *Id.*

11  In April 2012, users posted more than 3.3 million ads on Backpage.com.  *Id.* at ¶ 4.  That

12 same month, Backpage.com blocked, banned or removed more than 1 million user submissions

13 and posts and referred approximately 400 posts to NCMEC.  *Id.* at ¶14.

14  2. <u>Plaintiff in Intervention the Internet Archive</u>

15  The Internet Archive is a non-profit corporation whose mission is to build an "Internet

16 library," offering permanent access to historical collections that exist in digital format for

17 researchers, historians, and scholars. Dkt. #36, ¶ 13.  Founded in 1996, IA works to prevent the

18 Internet and other "born-digital" materials from disappearing into the past.  *Id.* at ¶ 16.  As part

19 of this mission, IA regularly gathers "snapshots" of content on the World Wide Web through a

20 "crawling" and indexing process.  *Id.*  It currently maintains over 150 billion web pages archived

21 from 1996 to the present from web sites around the world, including archives of third-party

22 content posted to web sites like Backpage.com and craigslist.org.  *Id* .  IA claims that SB 6251

23 would severely impede the practice of hosting third-party content online.  *Id.* at ¶ 3.

24

3.  <u>Human Trafficking and Child Exploitation on the Internet</u>

Experts estimate that at least 100,000 American juveniles are victimized through prostitution every year.  Dkt. #43, ¶ 3.  "A 2008 Seattle human services department report estimated that there are three hundred to five hundred children being exploited for sex in the Seattle area alone each year."  SB 6251 § 1.

Many child prostitutes are advertised through online escort advertisements displayed on Backpage.com and similar websites.  Dkt. #45, ¶ 19.  These advertisements are created by prostitutes or third parties at the direction of a pimp or by the pimp him- or herself.  *Id.*  Since 2010, the Seattle Police Department ("SPD") has recovered at least twenty-two children advertised online in the Seattle area for commercial sex.  SB 6251 § 1.

Although Backpage.com screens adult ads prior to posting, ads depicting minors still appear online. For example, Defendants point to a recent investigation in which a Backpage.com user identified a photograph associated with an escort ad in the "Seattle escorts" section of the website as depicting a minor.  *See* Dkt. #46, ¶¶ 5 - 20.  A few days later, on June 11, 2012, the juvenile depicted was arrested and booked into the King County juvenile detention center for prostitution.  *Id.* at ¶ 9.  Authorities identified the juvenile as "C.C." and confirmed that she was 15-years-old and that she had arranged to have sexual intercourse with a man for $80.  *Id.*

The same day that C.C. was arrested, Seattle Police Department detective Todd Novisedlak located another advertisement for C.C. posted on Backpage.com.  *Id.* at ¶ 11.  Novisedlak contacted Backpage.com, asking that the ad be removed as it depicted a confirmed minor. *Id.* at ¶12.  Novisedlak also asked that all other advertisements posted by the same user also be removed.  *Id.*  Backpage.com subsequently removed the ad identified by the detective.  *Id.* at ¶ 13.

On June 19, 2012, the FBI distributed another NCMEC report to the SPD regarding a Backpage.com ad depicting C.C. *Id.* at ¶ 14. This ad had been reported to NCMEC by a Backpage.com moderator who felt that the person depicted in the ad looked young. *Id.*

Over the course of the next week, Detective Novisedlak identified an additional six advertisements depicting C.C. *Id.* at ¶ 17. Each of the advertisements listed the same phone number and included the same pictures of C.C. *Id.* All but one of the ads listed prices as 15-20 Min - $60; 30 Min - $80; 1 Hr - $110. *Id.*

On June 24, 2012, an undercover police officer with the King County Sheriff's Office viewed an advertisement on Backpage.com that depicted C.C. *Id.* at ¶ 18. The officer called the number on the advertisement and arranged a meeting with a female. *Id.* at ¶ 19. The officer and the female agreed on a price of $80 for 30 minutes and an address at which to meet. *Id.* Upon arriving at the address, the officer discovered fifteen-year-old C.C. *Id.*

Detective Novisedlak states that in the course of conducting investigations into the commercial sexual abuse of minors, he has visited the escort sections of several websites, including Backpage.com, and viewed hundreds of advertisements for what appeared to be prostitution services. *Id.* at ¶ 3. He has never contacted any person, juvenile or otherwise, posting advertisements on the escorts section of Backpage.com who was advertising for legitimate escort services. *Id.*

4. <u>Senate Bill 6251</u>

SB 6251 makes it a felony to knowingly publish, disseminate, or display or to "directly or indirectly" cause content to be published, disseminated or displayed if it contains a "depiction of a minor" and any "explicit or implicit offer" of sex for "something of value." Under the proposed law, it is not a defense that the defendant did not know the age of the person depicted and the defendant may not rely on representation by or the apparent age of the person depicted.

The only defense allowed under the law is that a defendant obtained and retained government or school identification for the person depicted.

The substantive provisions of the law are as follows:

(1) A person commits the offense of advertising commercial sexual abuse of a minor if he or she knowingly publishes, disseminates, or displays, or causes directly or indirectly, to be published, disseminated, or displayed, any advertisement for a commercial sex act, which is to take place in the state of Washington and that includes the depiction of a minor.

  (a) "Advertisement for a commercial sex act" means any advertisement or offer in electronic or print media, which includes either an explicit or implicit offer for a commercial sex act to occur in Washington.

  (b) "Commercial sex act" means any act of sexual contact or sexual intercourse, both as defined in chapter 9A.44 RCW, for which something of value is given or received by any person.

  (c) "Depiction" as used in this section means any photograph or visual or printed matter as defined in RCW 9.68A.011(2)  and (3).

(2) In a prosecution under this statute, it is not a defense that the defendant did not know the age of the minor depicted in the advertisement.  It is a defense, which the defendant must prove by a preponderance of the evidence, that the defendant made a reasonable bona fide attempt to ascertain the true age of the minor depicted in the advertisement by requiring, prior to publication, dissemination, or display of the advertisement, production of a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement and did not rely solely on oral or written representations of the minor's age, or the apparent age of the minor as depicted.  In order to invoke the defense, the defendant must produce for inspection by law enforcement a record of the identification used to verify the age of the person depicted in the advertisement.

5.  <u>Procedural history</u>

SB 6251 was scheduled to go into effect on June 7, 2012.  Plaintiff filed this action on June 4, 2012, pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, to enjoin enforcement of SB 6251, claiming that the new law violates the Communications Decency Act of 1996, 47 U.S.C. § 230, and the First, Fifth, and Fourteenth Amendments and

1   Commerce Clause of the United States Constitution.  *See* Dkt. #1.  That same day,

2   Backpage.com filed a motion for a Temporary Restraining Order and Preliminary Injunction to

3   preliminarily enjoin Defendants from enforcing the law, pending a final decision on the merits.

4   *See* Dkt. #2.

5         On June 5, 2012, the Court entered a temporary restraining order ("TRO") for a period of

6   fourteen days, restraining Defendants from taking any actions to enforce SB 6251 or pursue

7   prosecution under the law in any way.  *See* Dkt. #7.  Plaintiff's motion for a preliminary

8   injunction was set for hearing on Friday, June 15, 2012.  On June 7, 2012, the parties stipulated

9   to a continuance of the hearing on Plaintiff's motion for a preliminary injunction and to an

10  extension of the TRO.  *See* Dkt. # 17.  Thereafter Plaintiff IA moved to intervene and IA's

11  motion was granted.  *See* Dkt. ## 22 & 33.  IA filed a motion joining in Backpage.com's motion

12  for a preliminary injunction (Dkt. # 34) and also filed a separate complaint (Dkt. # 36).

13        On July 10, 2012, Plaintiffs agreed to dismiss all claims against Stevens County

14  Prosecuting Attorney Tim Rasmussen, who agreed not to enforce SB 6251 during the pendency

15  of this lawsuit.  On July 20, 2012, this Court heard oral argument from the parties and took the

16  matter under advisement.

17  **B. Analysis**

18     1.  <u>Preliminary Injunction Standard</u>

19        At this juncture, Plaintiffs seek a preliminary injunction of the statute pending a final

20  determination on the merits.  A "preliminary injunction is an extraordinary remedy never

21  awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A

22  plaintiff seeking a preliminary injunction must establish; (1) that he is likely to succeed on the

23  merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that

24  the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id.*; *see*

1 | *also Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).  Here, Plaintiffs have

2 | established each of the four requisites.

3 |     2.  <u>Standing</u>

4 |       "When contesting the constitutionality of a criminal statute, it is not necessary that the

5 | plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge the statute

6 | that he claims deters the exercise of his constitutional rights." *Babbitt v. United Farm Workers*

7 | *Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation marks and alterations omitted).  In the

8 | First Amendment context, "'it is sufficient for standing purposes that the plaintiff intends to

9 | engage in a course of conduct arguably affected with a constitutional interest and that there is a

10 | credible threat that the challenged provision will be invoked against the plaintiff.'" *Wong v.*

11 | *Bush,* 542 F.3d 732, 736 (9th Cir. 2008) (quoting *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1154–55

12 | (9th Cir.2000)).  A credible threat of prosecution exists when the challenged law "is aimed

13 | directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take

14 | significant and costly compliance measures or risk criminal prosecution." *Virginia v. Am.*

15 | *Booksellers Ass'n*, 484 U.S. 383, 392 (1988) (allowing booksellers to bring pre-enforcement

16 | challenge to law that would make it unlawful to knowingly display obscene material).

17 |       Plaintiffs can show that there is a credible threat that SB 6251 will be enforced against

18 | them. Washington legislators have openly stated that the challenged statute is aimed at

19 | Backpage.com and that they seek to eliminate escort ads and similar Internet postings.  *See*,

20 | *e.g.*, Dkt. #4, Ex. 2, p. 4; *see also* Dkt. #25, ¶ 22.  If Backpage.com and IA's interpretation of

21 | the statute is correct, "the threat of criminal prosecution under the law will require them to

22 | undertake the impossible task [of] review[ing] and censor[ing] third-party content, or obtain[ing]

23 |

24 |

1   and retain[ing] the required forms of identification from all third-party users seeking to post such

2   content, or block[ing] content altogether."  Dkt. #28, ¶26.[1]

3          Similarly, IA has "an actual and well-founded fear that the law will be enforced against

4   [it]."  *Am. Booksellers*, 484 U.S. at 393.  Defendants argue that the statute will not apply to IA

5   because, due to the nature of its service, it cannot "knowingly" publish, disseminate, or display

6   illegal content.  However, as discussed further below, whether the statute requires such

7   knowledge is in dispute.  The question is whether, if *IA's* interpretation of the statute is correct, it

8   will be forced to "take significant and costly compliance measures or risk criminal prosecution."

9   *Am. Booksellers Ass'n*, 484 U.S. at 392.  Given the nature of IA's service, and the fact that it

10  currently does not monitor the majority of the content that it provides through its Wayback

11  Machine, a criminal statute that imposed strict liability on IA would be costly indeed.

12         Moreover, even if IA lacked standing to bring an "as-applied" challenge to the law, it

13  certainly has standing to challenge the statute on its face.  In the First Amendment context,

14  "'[l]itigants ... are permitted to challenge a statute not because their own rights of free expression

15  are violated, but because of a judicial prediction or assumption that the statute's very existence

16  may cause others not before the court to refrain from constitutionally protected speech or

17  expression.'" *Secretary of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 956-957 (1984),

18  quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).  As in *American Booksellers*, "the

19  alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be

20

21  _____

22  [1] A verified complaint, like an affidavit, may support injunctive relief. *Thalheimer v. City of San
    Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) (citing *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th
23  Cir.1985); *Ross–Whitney Corp. v. Smith Kline & French Labs.*, 207 F.2d 190, 198 (9th
    Cir.1953)).
24

1   realized even without an actual prosecution." 484 U.S. at 393.   Third party standing is

2   appropriate in this case.

3      3.   <u>Likelihood of Success on the Merits</u>

4        Plaintiffs bring this lawsuit under 42 U.S.C. § 1983 and the Declaratory Judgment Act,

5   28 U.S.C. § 2201.  Plaintiffs claim that Defendants, who are prosecuting attorneys of each of the

6   counties of the state of Washington, will deprive them and others of their First, Fifth and

7   Fourteenth Amendment rights under the constitution, and will violate the dormant Commerce

8   Clause of the U.S. Constitution and the Communications Decency Act of 1996, 47 U.S.C. § 230,

9   if permitted to enforce SB 6251.  Plaintiffs are likely to succeed on the merits of their claims.

10       *a.   Communications Decency Act*

11        Plaintiffs argue that SB 6251 conflicts with and is therefore preempted by the

12   Communications Decency Act of 1996.  Three subsections of the CDA are relevant.  First,

13   subsection (c)(1) provides that "[n]o provider or user of an interactive computer service shall be

14   treated as the publisher or speaker of any information provided by another information content

15   provider."  Second, subsection (c)(2)(A) provides that "[n]o provider or user of an interactive

16   computer service shall be held liable on account of – any action voluntarily taken in good faith to

17   restrict access to or availability of material that the provider or user considers to be obscene,

18   lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not

19   such material is constitutionally protected."  Third, subsection (e)(3) provides that "[n]othing in

20   this section shall be construed to prevent any State from enforcing any State law that is

21   consistent with this section.  No cause of action may be brought and no liability may be imposed

22   under any State or local law that is inconsistent with this section."

23        In enacting the CDA, "Congress decided not to treat providers of interactive computer

24   services like other information providers such as newspapers, magazines or television and radio

1    stations, all of which may be held liable for publishing or distributing obscene or defamatory

2    material written or prepared by others."  *Batzel v. Smith*, 333 F.3d 1026 (9th Cir. 2003) (internal

3    citation omitted).  Congress made this choice for two reasons.  First, "Congress wanted to

4    encourage the unfettered and unregulated development of free speech on the Internet, and to

5    promote the development of e-commerce."  *Id.* at 1027.  Second, Congress wanted to "encourage

6    interactive computer services and users of such services to self-police the Internet for obscenity

7    and other offensive material."  *Id.* at 1028.

8            Indeed, Section 230 was a reaction to a New York state court decision in which Prodigy,

9    an Internet access provider that ran online bulletin boards, was held liable for the libelous

10   statements of others.  *See Stratton Oakmont*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).

11   Prodigy was liable largely because of its active role in monitoring its bulletin boards and

12   "Congress was concerned with the impact such a holding would have on the control of material

13   inappropriate for minors."  *Batzel*, 333 F.3d at 1029.  "If efforts to review and omit third-party

14   … inappropriate material make a computer service provider or user liable for posted speech, then

15   website operators and Internet service providers [would be] likely to abandon efforts to eliminate

16   such material from their site."  *Id*. (citing, *inter alia*, S.Rep. No. 104-230, at 194 (1996); H.R.

17   Cong. Rep. No. 104-458, at 194 (1996); 141 Cong. Rec. at H84691-70 (1996)).

18          Thus, under Section 230 "any activity that can be boiled down to deciding whether to

19   exclude material that third parties seek to post online is perforce immune."  *Fair Housing*

20   *Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir.

21   2008).  "The message to website operators is clear: if you don't encourage illegal content, or

22   design your website to require users to input illegal content, you will be immune."  *Id.* at 1175.

23   Further, the Ninth Circuit acknowledges that "there will always be close cases where a clever

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 12

1   lawyer could argue that *something* the website operator did encouraged the illegality." *Id.* at

2   1174. "Such close cases … must be resolved in favor of immunity, lest we cut the heart out of

3   section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that

4   they promoted or encouraged – or at least tacitly assented to – the illegality of third parties." *Id.*

5        Plaintiffs argue that under this clear precedent, SB 6251 violates Section 230 because it

6   treats online service providers like Backpage.com and IA "as the publisher or speaker of any

7   information provided by another information content provider."  47 U.S.C. § 230(c)(1).

8   Defendants argue that SB 6251 is not preempted as it is consistent with the CDA; because, under

9   *Salerno*, there are applications of the law that do not conflict with the CDA; and because the

10  CDA does not apply to state criminal laws.

11                              *        *        *

12       The Supremacy Clause provides that federal law "shall be the supreme Law of the Land;

13  and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of

14  any State to the Contrary notwithstanding." Art. VI, cl. 2.  Under this principle, Congress has the

15  power to preempt state law. See *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 372

16  (2000).  However, in considering whether a state statute is preempted, "courts should assume

17  that 'the historic police powers of the States' are not superseded 'unless that was the clear and

18  manifest purpose of Congress.'"  *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (quoting

19  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); citing *Wyeth v. Levine,* 555 U.S. 555,

20  565 (2009)).

21       There are three circumstances in which Congress has the power to preempt state law.

22  First, Congress may expressly preempt inconsistent state laws. *Arizona v. U.S.*, 132 S. Ct. at

23  2500-01 ("There is no doubt that Congress may withdraw specified powers from the States by

24

1   enacting a statute containing an express preemption provision.").  Second, "the States are

2   precluded from regulating conduct in a field that Congress, acting within its proper authority, has

3   determined must be regulated by its exclusive governance." *Id.* (citing *Gade v. National Solid*

4   *Wastes Management Ass'n*, 505 U.S. 88, 115 (1992)).  Third, under the doctrine of conflict

5   preemption, state laws are preempted when they conflict with federal law. *Crosby,* 530 U.S. at

6   372.  "This includes cases where compliance with both federal and state regulations is a physical

7   impossibility and those instances where the challenged state law stands as an obstacle to the

8   accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. U.S.*,

9   132 S. Ct. at 2501 (internal quotations and citations omitted).

10       Here, Plaintiffs are likely to succeed on their claim that SB 6251 is preempted both

11  because it is likely expressly preempted and because it likely conflicts with federal law.

12  Subsection (e)(3) of Section 230 provides that "[n]othing in this section shall be construed to

13  prevent any State from enforcing any State law that is consistent with this section.  No cause of

14  action may be brought and no liability may be imposed under any State or local law that is

15  inconsistent with this section."  Therefore, Congress has expressly preempted state laws that are

16  "inconsistent with" Section 230.

17       SB 6251 is likely inconsistent with and therefore expressly preempted by Section 230 for

18  two reasons.  First, Section 230 prohibits "treat[ing]" "online service providers" as the "publisher

19  or speaker of any information provided by another information content provider."  47 U.S.C. §

20  230.  The parties do not dispute that Backpage.com and IA are "online service providers."  And

21  SB 6251 "treat[s]" both entities as the publisher or speaker of information created by third

22  parties."  It does this by imposing liability on Backpage.com and IA for information created by

23  third parties—namely ads for commercial sex acts depicting minors—so long as it "knows" that

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 14

1 it is publishing, disseminating, displaying, or causing to be published, disseminated, or displayed

2 such information.  *See Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) ("The majority of

3 federal circuits have interpreted [Section 230] to establish broad federal immunity to any cause

4 of action that would *make service providers liable* for information originating with a third-party

5 user of the service.") (internal citations omitted) (emphasis added); *Barnes v. Yahoo!, Inc.*, 570

6 F.3d 1096, 1101-02 (9th Cir. 2009) ("[W]hat matters is not the name of the cause of action…

7 [but] whether [it] inherently requires the court to treat the defendant as the 'publisher or speaker'

8 of content provided by another.").

9    Second, SB 6251 is inconsistent with Section 230 because it criminalizes the "knowing"

10 publication, dissemination, or display of specified content.  In doing so, it creates an incentive

11 for online service providers *not* to monitor the content that passes through its channels.  This was

12 precisely the situation that the CDA was enacted to remedy.  *See Batzel*, 333 F.3d at 1029.

13    Finally, and for the same reason, even if the wording of Section 230 prohibiting liability

14 under state laws "inconsistent" with the federal statute did not expressly preempt SB 6251, the

15 state statute likely conflicts with the CDA because "the challenged state law stands as an

16 obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

17 *Arizona v. U.S.*, 132 S. Ct. at 2501.  "Like the strict liability imposed by the *Stratton Oakmont*

18 court, liability upon notice reinforces service providers' incentives to restrict speech and abstain

19 from self-regulation."  *Zeran*, 129 F.3d at 333.

20    Defendants argue that SB 6251 is consistent with Section 230 because it is consistent

21 with Congress's purpose of "ensur[ing] vigorous enforcement of Federal criminal laws" and

22 because it is similar to federal statutes that Congress singled out as exempt from Section 230's

23 liability protection.  For example, Defendants point to 18 U.S.C. § 1591, which pertains to sex

24

1   trafficking of children.  Under Section 1591, anyone who knowingly benefits financially from

2   causing a person under the age of 18 to engage in a commercial sex act with knowledge or

3   reckless disregard of that fact is guilty of a criminal offense.  While both Section 1591 and SB

4   6251 pertain to sex trafficking of children, there are myriad differences between the state and

5   federal statutes.  Most importantly, Section 1591 pertains to conduct, whereas SB 6251 pertains

6   to speech.  As a result, 1591's effect on the operation of the Internet is incidental; SB 6251 is

7   directly aimed at online service providers.  Thus, even if SB 6251 seeks to achieve one of the

8   same goals as the federal law – policing the sex trafficking of minors – "it involves a conflict in

9   the method of enforcement." *Arizona*, 132 S. Ct. at 2505.  "The Court has recognized that a

10  '[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in

11  overt policy.'" *Id.* (citing *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 287 (1971)).

12          Nor are Defendants' other arguments likely to save SB 6251 from preemption.  In

13  determining whether a state statute is preempted by federal law, the Ninth Circuit has applied the

14  facial challenge standard from *United States v. Salerno*, 481 U.S. 739 (1987).  Under *Salerno*,

15  "the challenger must establish that no set of circumstances exists under which the Act would be

16  valid."  481 U.S. at 745.  Defendants argue that because SB 6251 may be applied in an off-line

17  environment, the statute is not preempted under *Salerno.*

18          The Supreme Court has called into question whether *Salerno* remains the standard for

19  facial challenges to state statutes on preemption grounds.  *See City of Chicago v. Morales*, 527

20  U.S. 41, 55 n.22 (1999) ("To the extent we have consistently articulated a clear standard for

21  facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in

22  any decision of this Court, including *Salerno* itself.").  Even assuming that *Salerno* remains the

23

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 16

1  standard, Defendants' ability to point to a non-preempted application of the law is not

2  dispositive.  The Ninth Circuit clarified how *Salerno* is to be applied in *United States v. Arizona*:

3  > [T]he question before us is not, as Arizona has portrayed, whether
   > state and local law enforcement officials can *apply* the statute in a

4  > constitutional way. Arizona's framing of the *Salerno* issue assumes
   > that S.B. 1070 is not preempted on its face, and then points out

5  > allegedly permissible applications of it. This formulation misses the
   > point: there can be no constitutional application of a statute that, on its

6  > face, conflicts with Congressional intent and therefore is preempted by
   > the Supremacy Clause.

7  *United States v. Arizona*, 641 F.3d 339, 346 (9th Cir. 2011) *cert. granted*, 132 S. Ct. 845, 181 L.

8  Ed. 2d 547 (U.S. 2011) and *aff'd in part, rev'd in part and remanded*, 132 S. Ct. 2492 (U.S.

9  2012) (emphasis in original).

10        Here, as in *Arizona*, the state statute conflicts with Congressional intent because, by

11  imposing liability on online service providers who do not pre-screen content or who "know" that

12  third party content may violate state law, the statute drastically shifts the unique balance that

13  Congress created with respect to the liability of online service providers that host third party

14  content.

15        Finally, Defendants argue that the CDA was intended only to apply to civil actions

16  brought under state law and was not intended to apply where state criminal law provided the

17  cause of action.  Statutory interpretation begins with the statutory text, *BedRoc Ltd., LLC v.*

18  *Western Elite, Inc.,* 541 U.S. 176, 183 (2004), and statutes should be interpreted to give effect, if

19  possible, to every clause and word, *Duncan v. Walker,* 533 U.S. 167, 174 (2001).  When

20  "Congress includes particular language in one section of a statute but omits it in another section

21  of the same Act … it is generally presumed that Congress acts intentionally and purposely in the

22  disparate inclusion or exclusion." *Clay v. United States*, 537 U.S. 522, 528-29 (2003) (internal

23  quotations omitted).

24

1  The section of the CDA entitled "No effect on criminal law" provides that "[n]othing in

2  this section shall be construed to impair the enforcement of section 223 or 231 of this title,

3  chapter 71 (regarding obscenity) or 110 (relating to sexual exploitation of children) of title 18, or

4  any other *Federal* criminal statute." 47 U.S.C. § 230(e)(1) (emphasis added). In contrast, the

5  section entitled "No effect on communications privacy law" provides "[n]othing in this section

6  shall be construed to limit the application of the Electronic Communications Privacy Act of 1986

7  or any of the amendments made by such Act, *or any similar State law*." *Id.* at § 230(e)(4). If

8  Congress did not want the CDA to apply in state criminal actions, it would have said so. *See*

9  *Voicenet Commc'ns, Inc. v. Corbett*, 2006 WL 2506318, at *4 (E.D. Pa. Aug. 30, 2006) ("[T]he

10  plain language of the CDA provides internet service providers immunity from inconsistent state

11  criminal laws.").

12      The Court finds that Plaintiffs are likely to succeed on their claim that Section 230

13  preempts SB 6251.

14      *b.  First Amendment*

15      Even if Plaintiffs did not succeed on their claim that SB 6251 is preempted by the CDA,

16  they likely can succeed on their claim that the statute runs afoul of the First Amendment. The

17  First Amendment to the United States Constitution provides in pertinent part that "Congress shall

18  make no law … abridging freedom of speech." The prohibitions of the First Amendment extend

19  to the several States through the Fourteenth Amendment. Thus, "[s]tatutes suppressing or

20  restricting speech must be judged by the sometimes inconvenient principles of the First

21  Amendment." *United States v. Alvarez*, 132 S.Ct. 2537, 2543 (2012).

22      Plaintiffs argue that the statute violates the First and Fourteenth Amendments on three

23  grounds. First, Plaintiffs argue that the statute is unconstitutional because it creates strict liability

24  for publishing unprotected speech and in doing so chills protected speech. Second, Plaintiffs

1  argue that the statute is unconstitutionally vague because it does not provide defendants fair

2  notice of what constitutes illegal speech and allows for arbitrary enforcement.  Third, Plaintiffs

3  contend that the statute is overbroad in that it effectively restricts the publication, display, and

4  dissemination of both protected and unprotected speech.  Where a statute restricts protected

5  speech, it is subject to strict scrutiny.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460

6  U.S. 37, 45 (1983).   Plaintiffs argue that the statute cannot withstand strict scrutiny because,

7  while the government has a compelling interest in combating child prostitution, Defendants have

8  not shown that the challenged statute is the least restrictive means available to do so.  As set

9  forth more fully below, Plaintiffs are likely to succeed on the merits of their First Amendment

10 claims.

11 *(i)   Strict Liability*

12        The Constitution prohibits the "imposition of criminal sanctions on the basis of strict

13 liability where doing so would seriously chill protected speech."  *United States v. United States*

14 *District Court*, 858 F.2d 534, 540 (9th Cir. 1988).   Plaintiffs contend that SB 6251 is an

15 unconstitutional strict liability crime that chills protected speech because (a) the word

16 "knowingly" only applies to the first clause of the statute; and (b) there is no *scienter*

17 requirement regarding the age of the person depicted in the ad.  Defendants dispute Plaintiffs'

18 interpretation of the statute, arguing that strict liability only exists as to the age element of the

19 crime.  Therefore, before the Court reaches the constitutional issue, it must determine what the

20 statute says.

21                                  *       *       *

22        When interpreting a state statute as a matter of first impression, a federal court must

23 interpret the law as would the state's highest court. *See In re Kolb*, 326 F.3d 1030, 1037 (9th Cir.

24 2003).  In Washington, the Court begins with the plain language of the statute, assuming that the

1 legislature "meant exactly what it said." *Duke v. Boyd*, 942 P.2d 351, 354 (Wash. 1997).

2 However, if the statute is ambiguous, the Court may consider legislative history and the

3 "circumstances surrounding the enactment of the statute*." Five Corners Family Farmers v.*

4 *State*, 268 P.3d 892, 900 (Wash. 2011).  A statute is ambiguous if it is susceptible to two or more

5 reasonable interpretations.  *Id.*  Finally, "[w]here possible, statutes should be construed so as to

6 avoid unconstitutionality."  *Wash. State Republican Party v. Wash. State Public Disclosure*

7 *Comm'n*, 4 P.3d 808, 827 (Wash. 2000).

8   SB 6251 is comprised of two clauses.  The Court will refer to the first clause ("publishes,

9 disseminates, or displays") as the "publishing clause" and the second clause ("causes directly or

10 indirectly, to be published disseminated, or displayed") as the "causing clause".  Plaintiffs

11 assume that the word "knowingly" applies only to the publishing clause and that the causing

12 clause is devoid of any *scienter* requirement.  Defendants argue that the statute was intended to

13 require proof of *scienter* as to all elements except the age of the minor depicted.

14   Plaintiffs' reading of the statute is the most grammatical reading.  The word "knowingly"

15 precedes the publishing clause, but not the causing clause.  The publishing clause is separated

16 from the causing clause by interruptive punctuation and the word "or." The operative verb in the

17 causing clause ("cause") is already modified by two other adverbs ("directly or indirectly").  The

18 construction proposed by Defendants in which a third adverb modifies "cause" is awkward, if

19 not ungrammatical.  Namely, under Defendants' reading, a person commits a felony by

20 "knowingly… causing … indirectly to be … displayed" illegal content.

21   Defendants' interpretation of the statute, while awkward, is nonetheless reasonable.  The

22 publishing and causing clauses are not set forth in separate sections or subsections of the statute

23 and the punctuation that separates the clauses is one of the least interruptive available: the

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 20

1  comma.  Since the parties have each offered reasonable interpretations of the statute, the Court

2  must ascertain the legislature's intent by reference to legislative history.  *Five Corners*, 268 P.3d

3  at 900.

4       Generally speaking, "some indication of congressional intent, express or implied, is

5  required to dispense with *mens rea* as an element of a crime."  *Staples v. United States*, 511 U.S.

6  600, 605 (1994); *see also State v. Williams*, 148 P.3d 993, 996 (Wash. 2006) (*en banc*)

7  (discussing *Staples*).  In the Senate Hearing on SB 6251, Senator Jeanne Kohl-Welles indicated

8  that the primary impetus in passing SB 6251 was to require online service providers like

9  Backpage.com to request and obtain identification before posting ads that appeared to be online

10  advertisements for prostitution. *See* Dkt. #4, Ex. 2, p. 4 ("The Seattle Weekly… in its print…

11  publications, does require age verification in person… And what we would like to have happen

12  is to have that same requirement for online advertisement postings.").  In contrast, there is no

13  indication in the legislative history that the Washington legislature intended to punish companies

14  or individuals, like IA, who did not "know" that they were causing to be published, displayed, or

15  disseminated content deemed illegal under the statute.[2]  Therefore, the Court will interpret the

16  statute as requiring *scienter* as to *both* the publishing and causing clauses.

17                                *        *        *

18       Plaintiffs argue that, even adopting Defendants' construction, by dispensing with a

19  *scienter* requirement as to the age of the person depicted in the ad, SB 6251 runs afoul of the

20  First Amendment.  *See United States v. X-Citement Video, Inc.*, 982 F.2d 1285, 1291-92 (9th Cir.

21  1992) (interpreting a law prohibiting the interstate transfer of child pornography as containing a

22  _____

23       [2] As explained further below, the term "know" in the context of this statute likely renders
the statute unconstitutionally vague.  However, for the purposes of this section, the Court

24  assumes that the term "know" has a discernible meaning.

1   *scienter* requirement because "a statute completely bereft of a *scienter* requirement as to the age

2   of the performers would raise serious constitutional doubts"). This is likely true.

3         By its terms, SB 6251 dispenses with any *scienter* requirement as to the age of the minor

4   "depicted" in the advertisement:

5   > *[I]t is not a defense that the defendant did not know the age of the*
> *minor depicted in the advertisement.* It is a defense, which the
6   > defendant must prove by a preponderance of the evidence, that the
> defendant made a reasonable bona fide attempt to ascertain the true
7   > age of the minor depicted in the advertisement by requiring, prior to
> publication, dissemination of display of the advertisement, production
8   > of a driver's license, marriage license, birth certificate, or other
> governmental or educational identification card or paper of the minor
9   > depicted in the advertisement and did not rely solely on oral or written
> representations of the minor's age, or the apparent age of the minor as
10  > depicted. In order to invoke the defense, the defendant must produce
> for inspection by law enforcement a record of the identification used
11  > to verify the age of the person depicted in the advertisement.

  SB 6251 (emphasis added).

12

13        At first blush, requiring publishers to check identification before publishing an escort ad

14  seems as commonsensical as requiring bar owners to check identification before allowing

15  patrons to enter the door. There is, however, a key difference between these two scenarios. The

16  latter is an identification requirement related to conduct – drinking alcohol in a bar. The former

17  is an identification requirement—imposed by the government and punishable by imprisonment—

18  related to speech. Since there is no constitutional right to drink alcohol, courts tasked with

19  upholding the Constitution care little if a bar's identification verification process results in a line

20  forming outside the door, or causes some restaurants to stop serving liquor. However, because

21  there is a constitutional right to free speech, the Constitution cannot permit similar collateral

22  consequences in the First Amendment context. *See United States of America v. United States*

23  *District Court for the Central District of California,* 858 F.2d 534, 539 (9th Cir. 1988) ("[A]

24  speaker may not be put at complete peril in distinguishing between protected and unprotected

1   speech.  Otherwise, he could only be certain of avoiding liability by holding his tongue, causing

2   him 'to make only statements which 'steer far wide [] of the unlawful zone.'").

3        In *Smith v. California,* 361 U.S. 147 (1960), the Supreme Court struck down a Los

4   Angeles ordinance making it a crime for booksellers to possess obscene books.  Even though the

5   First Amendment does not protect obscene speech, the Court concluded that a bookseller could

6   not be held criminally liable without proof of knowledge regarding the contents of the book:

7

8        By dispensing with any requirement of knowledge of the contents of
         the book on the part of the seller, the ordinance tends to impose a
         severe limitation on the public's access to constitutionally protected
9        matter. For if the bookseller is criminally liable without knowledge of
         the contents, and the ordinance fulfills its purpose, he will tend to
10       restrict the books he sells to those he has inspected; and thus the State
         will have imposed a restriction upon the distribution of
11       constitutionally protected as well as obscene literature.
    *Smith,* 361 U.S. at 153.

12       Plaintiffs contend that here, as in *Smith,* SB 6251 would compel those publishers and

13  distributors who did not abstain from publishing large categories of speech altogether to review

14  every book, magazine, video, or online post containing a "depiction" and a possible "implicit" ad

15  for sex to ensure that none ran afoul of the law.  *See Smith*, 361 U.S. at 153-54.  The Court finds

16  that this is likely true.  A pre-screening mechanism as set forth in SB 6251 would limit the

17  amount of content available on some publishers' websites to the amount of content that such

18  publishers had the time and money to screen.  *See id.*  Some individuals would be reticent to

19  provide government identification in connection with borderline content, such as racy personal

20  ads, thus further diminishing the universe of protected speech available online.  *See also Doe v.*

21  *2TheMart.com Inc.,* 140 F.Supp.2d 1088, 1092, 1097 (W.D.Wash.2001) ("[T]he constitutional

22  rights of Internet users, including the First Amendment right to speak anonymously, must be

23

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 23

1   carefully safeguarded.").  The Constitution does not permit such collateral burdens on protected

2   speech.

3          Nor is this effect dissipated in a regime in which criminal liability is triggered only by

4   notification or knowledge that "illegal" content is available on an actor's website.  "Liability

5   upon notice reinforces service providers' incentives to restrict speech and abstain from self-

6   regulation."  *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997).  This is because a

7   publisher who receives notice that content *might* be illegal would have no incentive to ensure

8   that such content is *in fact* illegal.  Rather, the rational choice in such a scenario is to remove the

9   content as quickly as possible, whether or not it constitutes protected speech.

10          Finally, an affirmative defense to escape liability, as exists here, does not render the

11   statute constitutional.  "[T]he possibility of mistaken factfinding—inherent in all litigation—will

12   create the danger that the legitimate utterance will be penalized."  *Speiser v. Randall*, 357 U.S.

13   513, 526-527 (1958).  Plaintiffs are likely to succeed on the merits of their claim that the strict

14   liability component of SB 6251 violates the First Amendment.

15   *(ii)   Vagueness*

16          Plaintiffs also challenge SB 6251 as unconstitutionally vague, in violation of the First,

17   Fifth and Fourteenth Amendments.  "[S]tandards of permissible statutory vagueness are strict in

18   the area of free expression . . . .  Because First Amendment freedoms need breathing space to

19   survive, government may regulate in the area only with narrow specificity."  *NAACP v. Button*,

20   371 U.S. 415, 433 (1963).  Thus, laws regulating speech are void for vagueness when they are so

21   ambiguous that a reasonable person cannot tell what expression is forbidden and what is allowed.

22   *See, e.g., Smith v. Goguen*, 415 U.S. 566, 569 (1974) (invalidating state law that prohibited

23   treating a flag "contemptuously"); *Baggett v. Bullitt*, 377 U.S. 360, 362 (1964) (loyalty oath

24   preventing "subversive person" from being employed in state was void for vagueness); *Houston*

1    *v. Hill*, 482 U.S. 451 (1987) (striking down city ordinance that made it unlawful to interrupt

2    police officers in the performance of their duties because the law "effectively grants the police

3    the discretion to make arrests selectively on the basis of the content of the speech").  Here, the

4    vagueness of SB 6251 is "a matter of special concern" because it is both a content-based

5    regulation of speech and a criminal statute.  *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844,

6    871 (1997).  In this scenario, "[i]n addition to the opprobrium and stigma of a criminal

7    conviction… [t]he severity of criminal sanctions may well cause speakers to remain silent rather

8    than communicate even arguably unlawful words, ideas, and images."  *Id.* at 872.

9         Plaintiffs argue that the statue fails to define important terms and thus prevents citizens

10   from knowing what is prohibited.  Among the terms that the Washington legislature has

11   neglected to define are "know," "indirect," "direct," "implicit" and "offer."  The Court finds that

12   Plaintiffs are likely to succeed in showing that such terms render the statute unconstitutionally

13   vague.

14        Much of this vagueness derives from the third party liability aspect of SB 6251.  The

15   pimp that publishes the advertisement certainly "knows" whether his offer is for sex, whether

16   explicitly or implicitly.  However, what does it mean for the website operator to "know" that an

17   advertisement "implicitly" offers sex?  In Washington, "a person acts knowingly or with

18   knowledge when … he or she has information which would lead a reasonable person in the same

19   situation to believe that facts exist which facts are described by a statute defining an offense."

20   Wash. Rev. Code Ann. § 9A.08.010(b)(ii).  However, where an online service provider publishes

21   advertisements that employ coded language, a reasonable person could believe that facts exist

22   that do not in fact exist: an advertisement for escort services may be just that.  Similarly,

23   Defendants contend that "offer" is used "to make clear that a transaction does not have to be

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 25

1    consummated for SB 6251 to apply."  However, if the offer is implicit, how can a third party

2    ascertain that which is being offered before the transaction is consummated?

3          Further, what does it mean to "knowingly … cause … indirectly" the publication of such

4    an implicit offer?  If a website operator like Backpage.com publishes an advertisement that uses

5    a "common code to thinly veil the offer of the sex act," *see* Dkt. # 41, p. 31, and IA subsequently

6    crawls that advertisement and publishes it through its Wayback Machine, knowing that

7    Backpage.com has an "adult services" ad section and does not verify identification, is IA liable if

8    it itself cannot produce photo identification?

9          Defendants offer several explanations for the disputed terms.  For example, Defendants

10   offer  that "'something of value' is used in the statute to indicate that it regulates not just offers

11   of sex for money, but also those offers to exchange sex for other valuable things, such as drugs."

12   Dkt. # 41, p. 32.  "'Implicit' is used to bring offers of sex within the statute's purview in cases

13   where the advertisement does not explicitly indicate that a sex act will be provided in exchange

14   for value." *Id.* at p. 31.  "'Directly or indirectly' is used in the statute to reach pimps." *Id.* at 32.

15         One of the purposes behind the vagueness doctrine is to prevent arbitrary enforcement

16   occasioned by unclear standards.  *See Grayned v. City of Rockford,* 408 U.S. 104, 108-109

17   (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and

18   juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

19   discriminatory application."). While the statute might find itself on better constitutional footing if

20   the statute included the definitions proffered by Defendants, it does not.  Further, nothing binds

21   Defendants, or their successors, to their current interpretations.  *See Free Speech Coal., Inc. v.*

22   *Attorney Gen. of U.S.*, 677 F.3d 519, 539 n. 15 (3d Cir. 2012) ("[A] promise by the government

23   that it will interpret statutory language in a narrow constitutional manner cannot, without more,

24

save a potentially unconstitutionally overbroad statute."). Plaintiffs are likely to succeed on their

claim that the statute is unconstitutionally vague.

*(iii) Overbreadth*

In addition to the strict liability and vagueness challenges above, Plaintiffs contend that

SB 6251 is overbroad and will have a chilling effect on the protected speech of publishers and

third-party content providers. *See Reno v. ACLU,* 521 U.S. at 872. ("The severity of criminal

sanctions may well cause speakers to remain silent rather than communicate even arguably

unlawful words, ideas, and images."). A statute regulating speech is overbroad if it "reaches a

substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v.*

*Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-495 (1982). The doctrine seeks to strike a

balance between competing social costs. *United States v. Williams*, 553 U.S. 285, 292 (2008).

"On the one hand, the threat of enforcement of any overbroad law deters people from engaging

in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand,

invalidating a law that in some of its applications is perfectly constitutional – particularly a law

directed at conduct so antisocial that it has been made criminal – has obvious harmful effects."

*Id.*

Defendants contend that the statute is not overbroad because it only regulates unprotected

speech. Defendants posit that the statute reaches only offers to engage in illegal conduct or, in

the alternative, that it regulates only commercial speech. It is true that "[o]ffers to engage in

illegal transactions are categorically excluded from First Amendment protection." *Williams*, 553

U.S. at 297 (citations omitted). It is also true that commercial speech, while protected under the

First Amendment, is afforded less protection that other forms of constitutionally protected

expression. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447

1  U.S. 557, 563 (1980).  SB 6251, however, encompasses more than offers to engage in illegal

2  transactions.  And it pertains to both commercial and non-commercial speech.

3   The statute criminalizes more than offers to engage in illegal transactions because the

4  statute encompasses transactions that are not illegal. Washington statutes criminalizing

5  commercial sexual abuse of a minor require that the defendant pay or agree to pay a "fee" "as

6  compensation" for a minor engaging or promising to engage in sexual content.  *See* Wash. Rev.

7  Code Ann. § 9.68A.100. [3]  The adult prostitution statute requires that a person engage or agree to

8  engage in sexual conduct with another person "in return for a fee".  *Id.* at § 9A.88.030.[4]  In

9  contrast, SB 6251 proscribes any "offer" for "any act of sexual contact or sexual intercourse …

10  for which something of value is given or received by any person," so long as that offer includes a

11  depiction of a minor.  Assuming that the undefined term "something of value" means anything

12  that can be traded on a free market—including a bottle of wine, a nice dinner, or a promise to do

13  the dishes—SB 6251's definition of "commercial sex act" encompasses vast swaths of legal,

14  consensual, non-commercial sexual activity.[5]  Moreover, there is no requirement that the minor

15

16

17   [3] Under Washington criminal law, a person is guilty of commercial sexual abuse of a minor if "he or she pays a *fee* to a minor or a third person *as compensation* for a minor having engaged in sexual conduct with him or her" or "agrees to pay a *fee* to a minor or a third person pursuant to an understanding that *in return therefore* such minor will engage in sexual conduct with him or her." Wash. Rev. Code Ann. § 9.68A.100 (emphasis added).

18

19   [4] The statute criminalizing adult prostitution provides that a person is guilty of a misdemeanor if he or she "engages or agrees or offers to engage in sexual conduct with another person *in return for a fee*." Wash. Rev. Code Ann. § 9A.88.030 (emphasis added).

20

21   [5] Defendants argue that the term "commercial sex act" tracks language from a federal statute criminalizing sex trafficking.  *See* 18 U.S.C. § 1591(e)(3).  While this is true, the federal statute requires that the defendant recruit, entice, harbor, transport, provide, obtain, or maintain a minor and that he or she know or recklessly disregard the fact that the minor will be caused to engage in a commercial sex act.  *Id.* at § 1591(a).  Defendants point to no federal statute providing that a "commercial sex act," as defined by SB 6251, in and of itself constitutes illegal conduct.

22

23

24

1   depicted with the offer have any relation to the offer itself.  Thus, a twenty-five-year old's profile

2   on a dating website might fall under the statute if (a) one of the photographs associated with her

3   profile was a picture of herself in high school and (b) she mentioned that she is "good in bed"

4   and looking for a man to "cook her dinner every night".  For that matter, a teenager's Facebook

5   profile, aimed at her teenage friends but of course available to the world, teeming with the kinds

6   of scandalous, provocative photographs and musings that are typical for some in this age group,

7   could also fall under the language of SB 6251.

8          In addition, SB 6251 does not fall within the exception for offers to engage in illegal

9   activity because SB 6251 prohibits not only "offers" to engage in commercial sex acts, but also

10  the direct and indirect publication, dissemination, and display of such offers.  The third-party

11  publication of offers to engage in illegal transactions does not fall within "well-defined and

12  narrowly limited classes of speech" that fall outside of First Amendment protection. *Chaplinski*

13  *v. State of New Hampshire*, 315 U.S. 568, 571-572 (1942).  *See also Brown v. Entertainment*

14  *Merchants Ass'n*, 131 S.Ct. 2729, 2733 (2011) ("[N]ew categories of unprotected speech may

15  not be added to the list by a legislature that concludes certain speech is too harmful to be

16  tolerated.").

17         Nor is SB 6251 limited to commercial speech, which is entitled to less protection under

18  the Constitution. *Central Hudson* defines "commercial speech" as "expression related solely to

19  the economic interests of the speaker and its audience."  447 U.S. at 561.  As just articulated, SB

20  6251 prohibits "offers" for sex acts that may only relate tangentially to the economic interests of

21  the speaker and audience.  Unlike the federal child pornography statute at issue in *United States*

22  *v. Williams*, 128 S.Ct. 1830, 1836 (2008) (extending criminal liability to one who "knowingly"

23  "advertises, promotes, presents, distributes, or solicits" what is believed to be child

24

1   pornography), SB 6251 reaches *beyond* direct proposals for commercial transactions to

2   criminalize the indirect dissemination of such content.[6]

3        The most problematic aspect of SB 6251 is not the protected speech that it regulates by

4   its terms, but the likelihood that it will chill a substantial amount of protected speech in addition

5   to the unprotected speech that Defendants argue the statute was meant to address. Defendants

6   contend that "[o]nline escort advertisements are thinly veiled offers of prostitution" and that if a

7   website "contains a section for postings for escort services," it can eliminate its potential for

8   liability under SB 6251 by either "ceasing the posting of advertisements for commercial sex acts

9   altogether" or "conduct[ing] age verification as provided in the affirmative defense." Dkt. # 41,

10  pp. 3 & 26.  The Court does not dispute that, in passing SB 6251, the Washington legislature's

11  intent was to provide this Hobson's Choice to website operators like Backpage.com.

12  Unfortunately, not only is this formulation of the statute likely unconstitutional itself, but it fails

13  to address the much more far-reaching effects of the statute.

14       Defendants present two pieces of evidence for the proposition that all online

15  advertisements for escort services are actually offers for prostitution.  The first is a declaration

16  stating that when taken to task over the issue, an attorney and board member of Village Voice

17  Media, Backpage.com's parent company, made the ambiguous statement, "Don't deny the

18  undeniable," and laughed.  Dkt. # 44, ¶3.  The second is a declaration from detective Todd

19  Novisedlak stating that he has never contacted any person posting advertisements on the escorts

20  section of Backpage.com who was advertising for legitimate escort services.  Dkt. #64, ¶ 4.  In

21

22  _____

23      [6] For example, IA could indirectly, knowingly cause to be disseminated content deemed illegal under SB 6251 in violation of the statute. However, because it is a not-for-profit entity that crawls the Internet for archival purposes, its doing so would be unrelated to its economic

24  interests or those of the academics and historians that use its services.

1   contrast, numerous states license, tax and otherwise regulate escort services as legitimate

2   businesses.  *See* Dkt. #61, p. 22 (listing statutes); *see also Dart v. Craigslist, Inc.*, 665 F. Supp.

3   2d 961, 968 (N.D. Ill. 2009) ("Plaintiff is simply wrong when he insists that [the adult services

4   category and related subcategories] are all synonyms for illegal sexual services.").  The Court

5   finds it unlikely that Defendants would be able to prove that *all* online advertisements for escort

6   services are ads for prostitution.  Thus, a website that contains a section for postings for escort

7   services that chooses to either shut down that section or require age verification will likely chill

8   protected speech in the course of doing so.

9        Much more importantly, SB 6251 reaches beyond websites that contain sections for

10  postings for escort services.  The statute does not in any way limit liability to websites that

11  contain such sections. Rather, SB 6251 extends to any direct or indirect publication,

12  dissemination of display of proscribed content. At oral argument, Defendants asserted that the

13  regulation would not affect websites like Facebook and Twitter because such websites do not

14  have specific sections for escort services and thus, to the extent that the websites publish

15  proscribed content, the websites do not "know" that their platforms are being used in this

16  manner.  However, Plaintiffs have provided evidence that, since craigslist.org removed its

17  "adult" category, escort advertisements have already begun to appear on Facebook and other

18  platforms.  *See*, *e.g.*, Dkt. #4, Ex. 2 (citing a study by a Columbia University professor showing

19  that 83 % of prostitutes have a Facebook page and that, by the end of 2011, Facebook would be

20  their number one medium of recruitment).  Whether or not Facebook already "knows" that it is

21  publishing such ads, if SB 6251 is enforced, Facebook will have a strong incentive to either ex-

22  ante monitor content that is posted to its website or require blanket age verification before photos

23

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 31

1    are uploaded to its site.  This kind of restriction could cause dangerous chilling effects across the

2    Internet.

3                                *        *        *

4           "Content-based prohibitions, enforced by severe criminal penalties, have the constant

5    potential to be a repressive force in the lives and thoughts of a free people."  *Ashcroft v. Am.*

6    *Civil Liberties Union*, 542 U.S. 656, 660 (2004).  "To guard against that threat the Constitution

7    demands that content-based restrictions on speech be presumed invalid and that the Government

8    bear the burden of showing their constitutionality."  *Id.* (internal citations omitted).  A content-

9    based limitation on speech will be upheld only where the state demonstrates that the limitation

10   "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that

11   end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

12          SB 6251 is a content based restriction on speech.  A law is content-based if, to enforce it,

13   "an official must necessarily examine the content of the message that is conveyed."  *Am. Civil*

14   *Liberties Union of Nev. V. City of Las Vegas*, 466 F.3d 784, 794 (9th Cir. 2006).  To prosecute an

15   individual for violating SB 6251, an official must determine whether a particular advertisement

16   contains each of the elements of the statute.

17          Since Plaintiffs have met their burden of showing that SB 6251 is a content-based

18   restriction that implicates First Amendment rights, it is Defendants' burden to demonstrate that

19   the statute is constitutional.  *Perry*, 460 U.S. at 45; *see also Thalheimer v. City of San Diego*, 645

20   F.3d 1109, 1115-16 (9th Cir. 2011) (holding that once the moving party makes a colorable claim

21   that its First Amendment rights have been infringed, or are threatened with infringement, "the

22   burden shifts to the government to justify the restriction").  To do so, Defendants must show that

23   SB 6251 is narrowly tailored to further a compelling government interest.  *Ashroft v. ACLU*, 542

24

1  U.S. at 666.  "In considering this question a court assumes that certain protected speech may be

2  regulated, and then asks what is the least restrictive alternative that can be used to achieve that

3  goal." *Id.*  (citing *Reno*, 521 U.S. at 874).

4       Defendants certainly have a compelling interest in curbing the exploitation of minors

5  through prostitution. The Supreme Court has recognized "that there is a compelling interest in

6  protecting the physical and psychological well-being of minors." *Sable Communications of*

7  *California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).  Indeed, "the protection of our young from

8  sexual abuse may be among the most important functions of a civilized society." *U.S. v. U.S.*

9  *District Court for the Central District of California,* 858 F.2d at 541 (citations omitted).  Jim

10  Pugil, Chief of the Seattle Police Department testified in hearings that "the online advertising of

11  youth for sexual exploitation is like an accelerant; if we liken the work of rescuing youth and

12  prosecuting pimps and their exploiters as a fire, allowing the advertising of youth on the Internet

13  for the pleasure of others is like adding fuel to the fire – it becomes too much, and near

14  impossible to rescue these children."  Dkt. #4, Ex. 2, p. 11.

15       Although Defendants have a compelling interest in curbing the sexual exploitation of

16  minors in Washington state, Defendants do not acknowledge that the statute reaches protected

17  speech, and therefore fail to show that SB 6251 is the least restrictive means available to forward

18  their compelling interest. For example, Defendants fail to demonstrate why a law targeting only

19  the individuals who post ads would not be effective, rather than seeking to impose felony

20  liability on online service providers and other parties "directly or indirectly" involved in the

21  dissemination of proscribed content.

22       Nor do Defendants address the many underinclusiveness arguments lodged by Plaintiffs.

23  "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the

24

1   interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v.*

2   *Entertainment Merchants Ass'n*, 131 S.Ct. 2729, 2740 (2011).   Because the statute requires that

3   a defendant publish an advertisement containing a "depiction" of a minor, defendants could

4   easily escape liability by simply excluding such depictions, depicting adults who appeared to be

5   minors, or depicting cartoon characters or inanimate objects.   Thus, a post that advertised "sex

6   with a fifteen year old - $100" would not fall under the statute as long as it did not include a

7   picture of that 15-year-old.   Potential defendants could also easily escape liability by submitting

8   forged identification or the identification of third persons, since the statute does not require that

9   the identification include a photograph of the person depicted in the advertisement.   *See Ashcroft*

10  *v. ACLU*, 542 U.S. at 666 (noting that age verification systems could be subject to evasion).

11  Finally, even if SB 6251 succeeded in diminishing the amount of advertising for child

12  prostitution on websites based in the United States, it could not prevent similar websites from

13  appearing overseas.   Given the global nature of the Internet, it would be no more difficult for

14  potential defendants to post advertisements on foreign websites than it would be for them to post

15  advertisements on websites located in the United States.   *See id.* (noting that a statute regulating

16  material harmful to minors had diminished effectiveness because "the providers of the materials

17  that would be covered by the statute simply can move their operations overseas").

18        "Speech shielded by the [First] amendment's protective wing must remain inviolate

19  regardless of its inherent worth.   The distaste we may feel as individuals toward the content or

20  message of protected expression cannot, of course, detain us from discharging our duty as

21  guardians of the Constitution." *U.S.  v. U.S. District Court for the Central District of California,*

22  858 F.2d at 541 (citations omitted).   For all of the reasons stated above, the Court finds that

23  Defendants are unlikely to succeed in meeting their burden of showing that SB 6251 is the least

24

1    restrictive means of advancing their compelling interest in curbing the sexual exploitation of

2    minors.

3                                    *        *        *

4         "The Nation well knows that one of the costs of the First Amendment is that it protects

5    the speech we detest as well as the speech we embrace." *Alvarez*, 132 S.Ct. at 2551.  While the

6    Washington legislature might pass a law that effectively and constitutionally regulates the

7    opprobrious content that victimizes the children of our communities, SB 6251 is not that statute.

8    The Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment

9    claims on all three grounds.

10        *c.  Commerce Clause*

11        Plaintiffs' final claim is that SB 6251 violates the Commerce Clause.  The Commerce

12   clause provides: "The Congress shall have Power … To regulate Commerce … among the

13   several States…."  U.S. Const., Art. I, § 8, cl. 3.  The Supreme Court has long recognized that

14   this affirmative grant of authority to Congress also encompasses an implicit or "dormant"

15   limitation on the authority of the States to enact legislation affecting interstate commerce.  *See,*

16   *e.g., Healy v. Beer Institute, et al.*, 491 U.S. 324, 326, and n. 1 (1989), *Hugues v. Oklahoma,* 441

17   U.S. 322, 326, and n. 2 (1979); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534-35

18   (1949).  Plaintiffs argue that SB 6251 violates the dormant commerce clause because it regulates

19   conduct that takes place wholly outside the state and because it regulates a unique aspect of

20   interstate commerce that demands national treatment.

21        A state cannot regulate conduct that takes place exclusively outside the state.  *Healy,* 491

22   U.S. at 336.  Where a state statute only has incidental effects on interstate commerce, the statute

23   will be upheld "[w]here the statute regulates even-handedly to effectuate a legitimate local public

24   interest," where "its effects on interstate commerce are only incidental," and where the burden

1   imposed on interstate commerce is not "clearly excessive in relation to the putative local

2   benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  "[T]he practical effect of the

3   statute must be evaluated not only by considering the consequences of the statute itself, but also

4   by considering how the challenged statute may interact with the legitimate regulatory regimes of

5   other States and what effect would arise if not one, but many or every, State adopted similar

6   legislation." *Healy,* 491 U.S. at 336.   Finally, there exist unique aspects of commerce that

7   demand national treatment. *See, e.g., Wabash, St. L. & P. Ry. Co. v. Illinois*, 118 U.S. 557 (1886)

8   (holding railroad rate exempt from state regulation).

9          SB 6251 likely violates the dormant commerce clause under each of the three tests

10   articulated above.  First, although SB 6251 defines "advertisement for a commercial sex act" as

11   an offer for a sex act "to occur in Washington," the advertisement itself may occur entirely

12   outside of the state and no act need take place in the state of Washington to trigger liability under

13   the statute.  Therefore it is a statute that regulates conduct that occurs wholly outside of the state

14   of Washington.

15          Second, the out-of-state burden will be significant.  To escape liability, online service

16   providers that post content that *might* be construed as containing "implicit" offers for sex

17   (including aggregators like IA, social networking sites like Facebook.com, and dating sites like

18   Match.com) will be required to collect government-issued identification, lest one of these offers

19   relates to conduct occurring in Washington. Such a screening process would constitute a

20   significant and costly change to the business operations of these corporations that have little to

21   no connection with the State of Washington.  Such a burden would be exponentially exacerbated

22   if every state were permitted to legislate its own requirements.  In contrast, Washington's interest

23   in prosecuting wrongdoers is undermined by the practical obstacles to exercising jurisdiction

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 36

1    over defendants whose criminal acts take place outside the state.  *See ACLU v. Johnson*, 194

2    F.3d 1149, 1161-62 (10th Cir. 1999) (holding that a New Mexico statute that criminalized

3    "dissemination" of materials  that are "harmful to minors" violated the Commerce Clause

4    because "the nature of the Internet" made it impossible for the statute to reach purely intrastate

5    conduct and the benefits to be achieved were limited).

6            Third, and for all of these reasons, the Internet is likely a unique aspect of commerce that

7    demands national treatment.  "The Internet is wholly insensitive to geographic distinctions" and

8    itself "represents an instrument of interstate commerce." *Amer. Libraries Assoc. v. Pataki*, 969

9    F.Supp. 160, 173 (S.D.N.Y. 1997).  *See also Chicago Lawyers Comm. For Civil Rights Under*

10   *Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666 (7th Cir. 2008) ("Online services are in some respects

11   like the classified pages of newspapers, but in others they operate like common carriers such as

12   telephone services."). Thus, "[t]he Internet, like … rail and highway traffic …, requires a

13   cohesive national scheme of regulation so that users are reasonably able to determine their

14   obligations." *Pataki*, 969 F. Supp. At 182; *cf. Wabash, St. L. & P. Ry. Co. v. Illinois*, 118 U.S.

15   557 (1886) (holding railroad rate exempt from state regulation).  Therefore, Plaintiffs are likely

16   to succeed on their claims that SB 6251 violates the dormant Commerce Clause.

17       4.   Remaining Preliminary Injunction Requirements

18           Having shown a likelihood of success on the merits, Plaintiffs adequately satisfy the

19   remaining elements for securing a preliminary injunction: irreparable harm, that the balance of

20   equities tips in their favor, and that an injunction would be in the public interest.  *See Winter*, 555

21   U.S. at 24.  First, "[t]he loss of First Amendment freedoms for even minimal periods of time,

22   unquestionably constitutes irreparable injury." *Thalheimer*, 645 F.3d at 1128 (quoting *Elrod v.*

23   *Burns*, 427 U.S. 347, 373 (1976)).  In addition, because the age verification mechanism

24   described in the law only provides an affirmative defense, even full compliance with SB 6251

1   cannot guarantee freedom from prosecution. *Id.* at 674 (J. Stevens, concurring) ("Speakers who

2   dutifully place their content behind age screens may nevertheless find themselves in court, forced

3   to prove the lawfulness of their speech on pain of criminal conviction.").

4          Second, the balance of equities tips in Plaintiffs' favor. The harm to the Government will

5   not be great. "No prosecutions have yet been undertaken under the law, so none will be

6   disrupted if the injunction stands." *Id.* at 671. While the injunction is upheld, Washington can

7   enforce other laws banning prostitution and the exploitation of minors.

8          Third, an injunction is in the public interest. This is because, "[w]here a prosecution is a

9   likely possibility, yet only an affirmative defense is available, speakers may self-censor rather

10  than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon

11  protected speech." *Ashcroft v. ACLU,* 542 U.S. at 670-671.

## III. CONCLUSION

13         Having considered Plaintiffs' motions, the responses and replies thereto, all declarations

14  and attached exhibits, and having heard the parties at oral argument, the Court hereby finds and

15  orders:

16         (1) Plaintiffs' motions for a preliminary injunction are hereby GRANTED. The parties

17             shall submit a joint proposed order preliminarily enjoining enforcement of SB 6251

18             within ten (10) days. The preliminary injunction will remain in place until such time

19             as the Court is able to reach a decision on the merits. Until the Court has received

20             and signed the parties joint proposed order, the temporary restraining order currently

21             in place (Dkt. #7) shall remain in effect.

22         (2) The Clerk of the Court is directed to forward a copy of this order to all counsel of

23             record.

24

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION - 38

1  Dated this 27th day of July 2012.

2

3

4  _____
   RICARDO S. MARTINEZ

5  UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24